**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| AMERICAN FARM BUREAU FEDERATION, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, LEADING BUILDERS OF AMERICA, MATAGORDA COUNTY FARM BUREAU, NATIONAL ALLIANCE OF FOREST OWNERS, NATIONAL ASSOCIATION OF HOME BUILDERS, NATIONAL ASSOCIATION OF MANUFACTURERS, NATIONAL CATTLEMEN'S BEEF ASSOCIATION, NATIONAL CORN GROWERS ASSOCIATION, NATIONAL MINING ASSOCIATION, NATIONAL PORK PRODUCERS COUNCIL, PUBLIC LANDS COUNCIL, and TEXAS FARM BUREAU, | |
|     Plaintiffs, | Civil Action No. ___15-cv-165___ |
|     v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; REGINA MCCARTHY, in her official capacity as ADMINISTRATOR OF U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL THOMAS P. BOSTICK, in his official capacity as CHIEF OF ENGINEERS AND COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS; and JO-ELLEN DARCY, in her official capacity as ASSISTANT SECRETARY OF THE ARMY, | |
|     Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AMERICAN FARM BUREAU FEDERATION, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, LEADING BUILDERS OF AMERICA, MATAGORDA COUNTY FARM BUREAU,

1

NATIONAL ALLIANCE OF FOREST OWNERS, NATIONAL ASSOCIATION OF HOME BUILDERS, NATIONAL ASSOCIATION OF MANUFACTURERS, NATIONAL CATTLE-MEN'S BEEF ASSOCIATION, NATIONAL CORN GROWERS ASSOCIATION, NA-TIONAL MINING ASSOCIATION, NATIONAL PORK PRODUCERS COUNCIL, PUBLIC LANDS COUNCIL, and TEXAS FARM BUREAU, for their Complaint against Defendants UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (EPA); REGINA MCCARTHY, in her official capacity as Administrator of the EPA; UNITED STATES ARMY CORPS OF ENGINEERS (the Corps; with EPA, the Agencies); LIEUTENANT GENERAL THOMAS P. BOSTICK, in his official capacity as Chief of Engineers and Commanding General of the United States Army Corps of Engineers; and JO-ELLEN DARCY, in her official capacity as Assistant Secretary of the Army for Civil Works (collectively, the Defendants), allege, by and through their attorneys, on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.    This is a lawsuit for declaratory judgment and injunctive relief challenging the legality of the final administrative rule titled "Clean Water Rule: Definition of 'Waters of the United States'" (the Rule), promulgated by the Defendants. The Rule was signed by Administrator McCarthy and Assistant Secretary Darcy on May 27, 2015, and was published in the Federal Register at 80 Fed. Reg. 37,054 on June 29, 2015.

2.    The Clean Water Act (CWA) with limited exceptions prohibits "discharg[ing] . . . any pollutant" (33 U.S.C. § 1311(a)) without a Section 402 permit for discharges covered by the National Pollution Discharge Elimination System (NPDES) or a Section 404 permit for discharges of dredged or fill material. The CWA defines the term "discharge of a pollutant" as the "addition of any pollutant to *navigable waters* from any point source." *Id.* § 1362(12)(A)

(emphasis added). "Navigable waters," in turn, are defined to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7). The Rule purports to "clarif[y]" the Agencies' definition of "waters of the United States" within the meaning of 33 U.S.C. § 1362(7)—*i.e.*, the scope of the Agencies' jurisdiction over waters. 80 Fed. Reg. 37,054.

3.   In fact, all that the Rule clarifies is that the Agencies are determined to exert jurisdiction over a staggering range of dry land and water features—whether large or small; permanent, intermittent, or ephemeral; flowing or stagnant; natural or manmade; and interstate or intrastate. That, they may not do. The Rule bears no connection to the statutory text, far exceeds the authority granted by the Commerce Clause, and violates the individual rights protected by the Due Process Clause. It also imposes impossible burdens on land users, requiring them to assess vast expanses of land (well beyond their own holdings) in an effort to determine if features on their land are subject to regulation under the CWA—to say nothing of the burdens it imposes when the features are, in fact, deemed jurisdictional. In promulgating the Rule, moreover, the Agencies have misread and distorted Supreme Court precedent interpreting the meaning of key terms used in the statute. They furthermore subverted the notice-and-comment process by (among other things) failing to seek comment on scientific reports relied on in the Rule and on major revisions of the Proposed Rule, conducting an inadequate economic analysis, and engaging in an unprecedented advocacy campaign that led to a distorted and biased comment process. The result is an opaque and unwieldy regulation that leaves the identification of jurisdictional waters so vague and uncertain that Plaintiffs and their members cannot determine whether and when the most basic activities undertaken on their land will subject them to drastic criminal and civil penalties under the CWA.

4.   This action arises under, and alleges violations of, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-706. In particular, the Defendants' actions in promulgating the Rule were "arbitrary, capricious, an abuse of discretion," and "otherwise not in accordance with law" under

5 U.S.C. § 706(2)(A); were "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B); were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C); and were "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

5.    Plaintiffs seek a declaration from the Court that the Defendants' actions as described in this Complaint violate the APA, and that the Rule departs from the plain text of the CWA, and violates certain provisions of the United States Constitution, including but not limited to the Commerce Clause of Article I, Section 8 and the Due Process Clause of the Fifth Amendment. Plaintiffs further seek an order vacating the Rule and enjoining its implementation or application.

## JURISDICTION AND VENUE

6.    This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331. It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706(1), 706(2)(A)(B)(C) & (D); and its general equitable powers.

7.    The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. That condition is met in this case because there is no other adequate remedy available in any other court.

8.    Defendants or intervening parties may argue that exclusive subject matter jurisdiction to review the Rule lies in the federal courts of appeals under Section 509(b) of the CWA, 33 U.S.C. § 1369(b)(1). *See* 80 Fed. Reg. at 37,104. That is mistaken. Section 509(b)(1) confers original jurisdiction on the courts of appeals only to review challenges to six exclusive categories of final EPA actions: those (A) promulgating standards of performance for sources of water pollution under 33 U.S.C. § 1316; (B) determining categories of sources of water pollution under 33 U.S.C. § 1316; (C) promulgating effluent standards and prohibitions under 33 U.S.C. § 1317; (D) making any determination as to a state permit program submitted under 33 U.S.C. § 1342(b); (E) approving or promulgating an effluent limitation under the NPDES program; (F) issuing or

denying a permit under the NPDES program; and (G) promulgating an individual control strategy under 33 U.S.C. § 1314(l).

9.   The Rule is not the promulgation of a standard of performance, a determination of a category of sources, the promulgation of an effluent standard or prohibition, a determination as to a state permit program, an approval of an effluent limitation, an issuance or denial of a permit, or the promulgation of an individual control strategy. Review is thus unavailable in the court of appeals under 33 U.S.C. § 1369(b)(1), and jurisdiction is proper in this Court under 28 U.S.C. § 1331 and 5 U.S.C. § 704. *See Friends of the Everglades v. EPA*, 699 F.3d 1280, 1287 (11th Cir. 2012) (rejecting original jurisdiction under Section 509(b) to review general CWA regulations); *Nw. Envt'l Advocates v. EPA*, 537 F.3d 1006, 1018 (9th Cir. 2008) (same).[1]

10.   Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because the defendants are officers or agencies of the United States, and one or more plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

## THE PARTIES

A.     **Plaintiffs**

11.   Plaintiff **American Farm Bureau Federation** (AFBF) is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. It is headquartered in the District of Columbia. Through its state and county Farm Bureau organizations, AFBF represents about 6

---

[1]     Because the Agencies refer to Section 509(b)(1) in the part of the Rule addressing judicial review (80 Fed. Reg. at 37,104), and out of an abundance of caution to preserve Plaintiffs' rights, certain Plaintiffs here anticipate filing subsequent protective petitions for review of the Rule in the United States Courts of Appeals, including in the Fifth Circuit. Plaintiffs are firmly of the view that judicial review of the Rule is available only under the APA in the district courts. Nevertheless, "[c]areful lawyers must apply for judicial review [in the court of appeals] of anything even remotely resembling" an action reviewable under Section 509(b)(1), *see Am. Paper Inst. v. EPA*, 882 F.2d 287, 288 (7th Cir. 1989), even where they believe that jurisdiction properly lies elsewhere.

million member families in all fifty states and Puerto Rico, including thousands of member families in Texas, including members who are directly and adversely impacted by the Rule. AFBF submitted comments on the Proposed Rule on November 5, 2014.[2] It also joined the comments of the Waters Advocacy Coalition (WAC), which submitted comments on behalf of a coalition of industry groups. WAC submitted it comments on the Proposed Rule on November 13, 2014.[3]

12. Plaintiff **American Petroleum Institute** (API) is a national trade organization representing over 650 companies involved in all aspects of the domestic and international oil and natural gas industry, including exploration, production, refining, marketing, distribution, and marine activities. API's members include producers, refiners, suppliers, pipeline operators, and marine transporters, as well as service and supply companies that support all segments of the industry. API and its members are dedicated to meeting environmental requirements while economically developing and supplying energy resources for consumers. API submitted comments on the Proposed Rule on November 14, 2014.[4] It also joined WAC's comments.

13. The **American Road and Transportation Builders Association**'s (ARTBA) membership includes private and public sector members that are involved in the planning, designing, construction and maintenance of the nation's roadways, waterways, bridges, ports, airports, rail and transit systems and generate more than $380 billion annually in U.S. economic activity, sustaining more than 3.3 million American jobs. ARTBA's more than 6,000 members are directly involved with the federal wetlands permitting program and undertake a variety of

[2] *Comments of the American Farm Bureau Federation on the U.S. EPA and U.S. Army Corps of Engineers Guidance Regarding Definition of "Waters of the U.S." Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 5, 2014).

[3] *Comments of the Waters Advocacy Coalition on the Envt'l Protection Agency's and U.S. Army Corps of Engineers' Proposed Rule to Define "Waters of the United States" Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 13, 2014) (corrected Nov. 14, 2014).

[4] *Comments of the American Petroleum Institute on the Definition of "Waters of the United States" Under the Clean Water Act – Proposed Rule (79 Fed. Reg. 22188, April 21, 2014)*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

construction-related activities that require compliance with the Clean Water Act. As part of the transportation construction process, ARTBA members are actively involved in the restoration and preservation of wetlands. Since the Clean Water Act's passage, ARTBA has actively worked to achieve the complementary goals of improving our nation's transportation infrastructure and protecting essential water resources. ARTBA submitted comments on the Proposed Rule on November 14, 2014.[5] It also joined WAC's comments on the Proposed Rule.

14. Plaintiff **Leading Builders of America** (LBA) is a national trade association representing 21 of the largest homebuilding companies in North America. Collectively LBA members build approximately 35% of all new homes in America. Its purpose is to preserve home affordability for American families. LBA member companies build across the residential spectrum from first-time and move-up to luxury and active-adult housing. In each of these segments, our members are leaders in construction quality, energy efficiency, design and the efficient use of land. Many of our members are also active in urban multi-family markets and also develop traditional and neo-traditional suburban communities. LBA joined WAC's comments on the Proposed Rule.

15. **Matagorda County Farm Bureau** (MCFB) is a non-profit grassroots organization whose purpose is to promote and develop agriculture in Matagorda County, Texas and to better the conditions and efficiency of its agricultural producers. MCFB has over 3,000 member families who are also members of the Texas Farm Bureau. The member family farmers and ranchers of Matagorda County are directly and adversely impacted by the Rule.

16. Plaintiff **National Alliance of Forest Owners** (NAFO) was formed in March 2008 to protect and enhance the economic and environmental value of privately-owned forests through

---

[5]   *Comments of the American Road and Transportation Builders Association Re: Definition of "Waters of the United States" Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

targeted policy advocacy at the national level. NAFO's members represent 80 million acres of private forests in 47 states, including Texas. NAFO works aggressively to sustain the ecological, economic, and social values of forests and to assure an abundance of healthy and productive forest resources for present and future generations. NAFO is committed to helping policy makers understand that working forests are essential to the natural resources infrastructure of the nation and key to addressing some of the highest priority issues facing our nation today. NAFO advocates for its members' interests before Congress and federal agencies and in judicial proceedings. NAFO submitted comments on the Proposed Rule on November 14, 2014.[6]

17. Plaintiff **National Association of Home Builders** (NAHB) is a national trade association incorporated in the State of Nevada. NAHB's membership includes more than 140,000 builder and associate members organized into approximately 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. In Texas, NAHB has 29 local associations, including the Texas Association of Builders and the Greater Houston Builders Association. Its members include individuals and firms that construct single-family homes, apartments, condominiums, and commercial and industrial projects, as well as land developers and remodelers. NAHB submitted comments on the Proposed Rule on November 14, 2014.[7] It also joined WAC's comments.

18. The **National Association of Manufacturers** (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12 million men and women, contributes roughly $2.1 trillion to the U.S. economy annually, has the largest economic impact of any major

---

[6] *Comments of the National Alliance of Forest Owners on Definition of "Waters of the United States" Under the Clean Water Act; Proposed Rule, 79 Fed. Reg. 22,188 (Apr. 21, 2014)*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

[7] *Comments of the National Association of Home Builders on Docket ID No. EPA-HQ-OW-2011-0880*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

sector and accounts for two-thirds of private-sector research and development. Its mission is to enhance the competitiveness of manufacturers and improve American living standards by shaping a legislative and regulatory environment conducive to U.S. economic growth. The NAM submitted comments on the Proposed Rule on November 14, 2014.[8]

19. Plaintiff **National Cattlemen's Beef Association** (NCBA) is the national trade association representing U.S. cattle producers, with more than 30,000 individual members and several industry organization members. NCBA represents more than 175,000 of America's farmers, ranchers and cattlemen who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests. NCBA and the Public Lands Council submitted joint comments on November 1, 2014[9] and joined WAC's comments on the Proposed Rule.

20. Plaintiff **National Corn Growers Association** (NCGA) was founded in 1957 and represents 42,000 dues-paying corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their states. NCGA and its 48 affiliated state organizations, including Corn Producers Association of Texas, work together to create and increase opportunities for corn growers. NCGA submitted comments on the Proposed Rule on November 14, 2014.[10] It also joined in WAC's comments.

---

[8]   *Comments of the National Association of Manufacturers on Docket ID No. EPA-HQ-OW-2011-0880 Proposed Rule – Clean Water Act; Definitions: Waters of the United States*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

[9]   *Comments of the National Cattlemen's Beef Association and the Public Lands Council on the U.S. EPA and U.S. Army Corps of Engineers' Definition of "Waters of the United States" Under the Clean Water Act*, Docket No. EPA-HQ-OW-2011-0880 (Nov. 1, 2014).

[10]   *Comments of the National Corn Growers Association in Response to the Environmental Protection Agency's and U.S. Army Corps of Engineers' Proposed Rule to Define "Waters of the United States" Under the Clean Water Act EPA-HQ-OW-2011-0880*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

21.  Plaintiff **National Mining Association** (NMA) is the national trade association of the mining industry. NMA's members include the producers of most of the Nation's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA has members located throughout Texas. NMA submitted comments on the Proposed Rule on November 14, 2014.[11] It also joined WAC's comments.

22.  Plaintiff **National Pork Producers Council** (NPPC) is an association of 43 state pork producer organizations, including the Texas Pork Producers Association, and the global voice in Washington, D.C., for the nation's 67,000 pork producers. NPPC conducts public policy outreach at both the state and federal level with a of goal meeting growing worldwide consumer demand for pork while simultaneously protecting the water, air, and other environmental resources that are in the care or potentially affected by pork producers and their farms. NPPC and its members have engaged directly with EPA over the last two decades regarding the development of water quality standards and have made significant capital investments in the design and operation of farms to comply with these environmental regulations. NPPC's members and their farms are directly and adversely impacted by the Rule. NPPC submitted comments on the Proposed Rule.[12] It also joined WAC's comments.

23.  Plaintiff **Public Lands Council** (PLC) represents ranchers who use public lands and preserve the natural resources and unique heritage of the West. PLC is a Colorado nonprofit corporation headquartered in Washington, D.C. PLC membership consists of state and national cattle, sheep, and grasslands associations. PLC works to maintain a stable business environment

---

[11]   *Comments of the National Mining Association on Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22188 (Apr. 21, 2014)*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 14, 2014).

[12]   *Comments of National Pork Producers Council on the Environmental Protection Agency and U.S. Army Corps of Engineers Proposed Rule to Define "Waters of the United States" Under the Clean Water Act EPA-HQ-OW-2011-0880*, Dkt. No. EPA-HQ-OW-2011-0880.

for public land ranchers in the West where roughly half the land is federally owned and many operations have, for generations, depended on public lands for forage. PLC separately joined NCBA's and WAC's comments on the Proposed Rule.

24.  The **Texas Farm Bureau** (TFB) was established in 1933 as a non-profit, grassroots, agricultural association representing family farmers and ranchers in Texas. TFB is committed to the advancement of agriculture and prosperity for rural Texas and is a member of the AFBF. TFB has over 510,000 member families and is associated with 206 member county Farm Bureau organizations across the state. TFB's mission is to be the voice of Texas Agriculture, to benefit all Texans through promotion of a prosperous agriculture for a viable, long-term domestic source of food, fiber and fuel. Its member farmers and ranchers work their land and rely on water resources and thus are directly and adversely impacted by the Rule. The TFB submitted comments on the Proposed Rule on November 11, 2014.[13]

## B.    Defendants

25.  Defendant United States Environmental Protection Agency is the agency of the United States Government with primary responsibility for implementing the CWA. Along with the Corps, EPA promulgated the Rule.

26.  Defendant Regina McCarthy is the Administrator of the EPA, acting in her official capacity. Administrator McCarthy signed the Rule on May 2, 2015.

27.  Defendant United States Army Corps of Engineers has responsibility for implementing the CWA. Along with EPA, the Corps promulgated the Rule.

28.  Defendant Lieutenant General Thomas P. Bostick is the Chief of Engineers and Commanding General for the U.S. Army Corps of Engineers, acting in his official capacity.

---

[13] *Comments of Texas Farm Bureau on Docket ID EPA-HQ-OW-2011-0880: Definition of "Waters of the United States" under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (Nov. 11, 2014).

29.   Defendant Jo-Ellen Darcy is the Assistant Secretary of the Army for Civil Works, acting in her official capacity. Assistant Secretary Darcy signed the Rule on May 27, 2015.

## STANDING

30.   Each Plaintiffs' members own and work on real property that includes land areas that may constitute "waters of the United States" under the Rule, and each Plaintiffs' members must comply with the CWA's prohibition against unauthorized "discharges" into any such areas that are jurisdictional.

31.   Because the Rule is vague in describing features that are purportedly "waters of the United States" and often requires unpredictable case-by-case determinations by the Agencies, each Plaintiffs' members do not know which features on the lands they own or use are jurisdictional and which are not. Continuing uncertainty as to which features are jurisdictional under the vague terms of the Rule (including "tributary," "adjacent waters," and "significant nexus") thus deprives each Plaintiffs' members of notice of what the law requires of them and makes it impossible for them to make informed decisions concerning the operation, logistics, and finances of their businesses.

32.   A first-time criminal offense for negligently discharging into a jurisdictional water without a permit is punishable by criminal penalties of up to $25,000 per violation per day, and up to one year in prison per violation. A first-time criminal offense for knowingly discharging into a jurisdictional water without a permit is punishable by criminal penalties of up to $50,000 per violation per day, and up to three years in prison per violation. *See* 33 U.S.C. § 1319(c). EPA may also impose civil penalties of up to $37,500 per discharge, per day, per offense, without regard to any knowledge (or lack of knowledge) of the jurisdictional status of waters of the United States.

33.   The CWA authorizes citizen suits by any "person or persons having an interest which is or may be adversely affected," 33 U.S.C. § 1365(g). Regardless of whether they are ultimately found liable, the regulated public can incur substantial costs defending against such suits.

34.   Law-abiding members of each of the Plaintiffs have incurred or will imminently incur continuing economic costs as they alter their activities (in particular, by abstaining from certain activities in certain areas of land) to accommodate the possibility that their activities will be deemed discharges into land features that are later determined by the Agencies to be jurisdictional waters.

35.   Some of Plaintiffs' members have initiated or will soon initiate the process of retaining engineers and consultants and obtaining jurisdictional determinations, NPDES permits, additional oil spill control plans or countermeasures under Section 311,  and Section 404 permits from the Agencies in order to comply or mitigate the risk of noncompliance with the Rule. Obtaining jurisdictional determinations and permits entails ongoing costs, including having to retain consultants, engineers, and lawyers over the course of years. *See* D. Sunding & D. Zilberman, *The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process*, 42 NAT. RESOURCES J. 59, 74, 76 (2002) (an "individual permit application" costs on average "over $271,596 to prepare"; "the cost of preparing a nationwide permit application averages $28,915"; nationwide permits "took an average of 313 days to obtain"; "it took an average of 788 days (or two years, two months) from the time they began preparing the application to the time they received an individual permit"); *Rapanos v. United States*, 547 U.S. 715, 721 (2006) (similar).

36.   As we explain in greater detail below, many land and water features covered by the Rule are not within the scope of any reasonable interpretation of the CWA and exceed the Agencies' authority under the Commerce Clause. Thus the Rule has caused or will cause each Plaintiff's members perceptible economic and non-economic harm by unlawfully hindering their productive use of improvements to land made in reliance on the pre-Rule status quo, and by unlawfully inhibiting their productive use and enjoyment of land and water features on their lands and at their places of work.

37.   The interests that each Plaintiff seeks to protect in this lawsuit are manifestly germane to its organizational purposes. The Plaintiffs' members engage in a wide range of activities across a wide range of landscapes that are directly impacted by the Rule. A primary purpose of each Plaintiff is to represent and protect the interests of its members in federal rulemaking and in litigation, challenging unlawful federal regulations that adversely affect their members.

38.   The Rule purports to establish the Agencies' jurisdiction over a wide range of features (such as ephemerally flowing ditches and streams) that would not have been deemed jurisdictional before promulgation of the Rule under the Supreme Court's prior interpretations of the Agencies' jurisdiction. Accordingly, the Rule requires members of the Plaintiffs either to alter their activities to avoid discharges to these features or to obtain permits when previously they would not have had to. Vacatur of the Rule would therefore remedy each Plaintiff's members' ongoing injuries, including by relieving them of continuing expenses, preventing arbitrary enforcement of the CWA, and allowing them more fully to use and enjoy various land and water features on their land and at their places of work.

39.   Each Plaintiff has members who would have standing to sue in their own right as parties regulated under the Clean Water Act.

40.   Neither the claims asserted nor the relief requested requires individual members' participation in this lawsuit.

41.   The Agencies' failure to provide an adequate opportunity for public comment prior to acting has caused both the Plaintiffs and their members injury; all Plaintiffs therefore have been aggrieved by promulgation of the Rule. *See generally JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994).

42.   The Plaintiffs invest substantial resources in a range of activities designed to assist their members with the gainful use of their land, including developing and defending uniform water quality standards and other accredited standards designed to ensure compliance with the

CWA and other environmental laws. The Rule frustrates and impairs those activities and consequently will consume the Plaintiffs' resources. The Plaintiffs accordingly have suffered remediable injuries in their own right. *See generally Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

## BACKGROUND

A.      **Procedural Background**

43.   The Rule is EPA's and the Corps's most recent attempt to define "waters of the United States." The Agencies' efforts were undertaken against the backdrop of three Supreme Court cases addressing the same term.

44.   The Supreme Court first addressed the interpretation of "waters of the United States" within the meaning of 33 U.S.C. § 1362(7) in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). That case concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property" to "a navigable waterway." *Id*. at 131. Noting that "the Corps must necessarily choose some point at which water ends and land begins" (474 U.S. at 132), the Court upheld the Corps' interpretation of "the waters of the United States" to include a wetland that is directly connected to, and thus "actually abuts on a navigable waterway." *Id*. at 135.

45.   The Supreme Court next addressed the interpretation of "waters of the United States" in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*). Following the Court's decision in *Riverside Bayview*, the Corps had "adopted increasingly broad interpretations of its own regulations under the Act." *Rapanos v. United States*, 547 U.S. 715, 725 (2006). At issue in *SWANCC* was the so-called Migratory Bird Rule, which purported to extend the Agencies' jurisdiction under the CWA to any intrastate waters "[w]hich are or would be used as habitat" by migratory birds. 51 Fed. Reg. 41217; *see also*

*SWANCC*, 531 U.S. at 163-164. In *SWANCC*, the Supreme Court considered the application of that rule to "an abandoned sand and gravel pit in northern Illinois." 531 U.S. at 162. Observing that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed [the Court's] reading of the CWA in *Riverside Bayview*," the Court held that these "nonnavigable, isolated, intrastate waters," which did not "actually abu[t] on a navigable waterway," were not "waters of the United States." *SWANCC*, 531 U.S. at 167, 171.

46. Finally, in *Rapanos v. United States*, 547 U.S. 715 (2006), the Court "consider[ed] whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the [CWA]." *Id*. at 729. Prior to *Rapanos*, "the Corps [had] interpreted its own regulations to include 'ephemeral streams' and 'drainage ditches' as 'tributaries' that are part of the 'waters of the United States.'" *Id*. at 725 (citing 33 C.F.R. § 328.3(a)(5)). "This interpretation extended 'the waters of the United States' to virtually any land feature over which rainwater or drainage passes and leaves a visible mark." *Ibid*. A four-Justice plurality outright rejected that interpretation, holding that "[waters of the United States] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id*. at 739. Justice Kennedy, concurring in the judgment, agreed that jurisdiction may have been lacking in *Rapanos* because there may not have been a requisite "significant nexus" between the waterbodies at issue and any navigable waters. *Id*. at 759-87.

47. In response to *Riverside Bayview*, *SWANCC*, and *Rapanos*, the Defendants have promulgated a new Rule redefining the term "waters of the United States."

48. On April 21, 2014, the Defendants published a Proposed Rule. 79 Fed. Reg. 22,188.

49. On May 27, 2015, Defendants signed the Rule.

50. On June 29, 2015, the Rule was published in the Federal Register. 80 Fed. Reg. at 37,054.

16

51.  The preamble to the Final Rule states that fourteen days after publication in the Federal Register, on July 13, 2015, at 1:00 pm Eastern Time, the Rule will become final for purposes of judicial review in the courts of appeals under Section 509(b). 80 Fed. Reg. at 37,104; 40 C.F.R. § 23.2. But because the Rule is not reviewable under Section 509(b) and jurisdiction properly lies in the district courts under the APA, 40 C.F.R. § 23.2 does not apply. The Rule is a "final agency action" within the meaning of 5 U.S.C. § 704 and is therefore immediately subject to challenge in this Court.

**B.      The Proposed Rule, the Agencies' Public Relations Campaign, and the Comment Process**

52.  Many of the Plaintiffs submitted joint comments on the Proposed Rule on November 13, 2014, and many also submitted individual comments. *See supra*, notes 2-13.

53.  A draft of EPA's so-called Connectivity Report was ostensibly subject to comment.[14] The report "provides much of the technical basis for this rule." 80 Fed. Reg. at 37,057. Although the Agencies represented that the Rule would be based on the final version of the Connectivity Report, that report was still under review by EPA's Science Advisory Board (SAB) throughout the entire comment period, and EPA cautioned in the draft report itself that the draft report was not to be cited or quoted.

54.  On October 17, 2014, the SAB submitted to EPA its recommendations for revisions to the Connectivity Report. Based on those recommendations, and well after the comment period closed, EPA made meaningful changes to the Connectivity Report. As a result, the public had no opportunity to comment on—or even see—the final scientific conclusions in the Connectivity Report during the comment period.

---

[14]  *U.S. Environmental Protection Agency, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report)*, EPA/600/R-14/475F (2015)) (Connectivity Report).

55.   Despite the delayed timeline for completion of the Connectivity Report, which denied the public an opportunity to review "the technical basis for [the Rule]" (80 Fed. Reg. at 37,057), Defendants refused to adequately extend the comment period or hold a second round of notice and comment to receive public input on critical aspects of the Rule.[15]

56.   Defendants used federal funds to engage in a substantial advocacy campaign for the Proposed Rule during the comment period. The campaign—which was a direct and express response to some of the Plaintiffs' public criticisms and concerns—was designed, both directly and indirectly, to influence Members of Congress, state government officials, and the general public. EPA, in particular, lobbied on behalf the Proposed Rule through news releases, webcasts, blog posts, and aggressive social media tactics; it generated superficial support for the Rule by using social media outlets like Twitter and Thunderclap to solicit mass support for non-specific statements such as, "Clean water is important to me. I support EPA's efforts to protect it for my health, my family, and my community." *See* perma.cc/F9U3-NW36.

57.   Defendants treated public participation in other third-party social media campaigns (such as electronic signatures on petitions generally supporting "clean water") as "comments" filed in support of the Proposed Rule. Through these superficial social media advocacy campaigns, Defendants helped generate hundreds of thousands of "comments" purportedly supporting the Rule, and relied on this "support" as a basis for issuing the Rule.

58.   Defendants made substantial changes to the Rule between publication of the Proposed Rule and promulgation of the Final Rule without inviting additional comments from the public.

---

[15]   *Cf.* National Pork Producers Council, *Request for Extension of Comment Period on EPA and Corps Proposed Rule "Defining Waters of the United States" Under the Clean Water Act, Docket ID No. EPA-HQ-OW-2011-0880*, Dkt. No. EPA-HQ-OW-2011-0880 (May 28, 2014); Waters Advocacy Coalition, *Request for Extension of Comment Period on EPA and Corps Proposed Rule Defining Waters of the United States" Under the Clean Water Act*, Dkt. No. EPA-HQ-OW-2011-0880 (May 13, 2014).

59. Defendants failed to meaningfully consider the direct economic costs and other financial burdens imposed by the Rule upon the regulated public, including the costs imposed on small businesses.

60. Defendants conducted a flawed cost-benefit analysis that dramatically underestimated certain costs imposed by the Rule, omitted other relevant costs from the analysis entirely, and overestimated certain benefits of the Rule. As one example, unavoidable impacts to newly jurisdictional features will require current permit-holders to engage in additional mitigation. EPA's economic analysis dramatically underestimates increased mitigation costs. The inherent uncertainty in the rule will furthermore increase costs of compliance, including defending against additional enforcement actions and citizen suits. EPA's economic analysis did not properly account for these and many other costs and lacks proper documentation and explanation.

61. Defendants failed to solicit or consider flexible regulatory proposals under the Regulatory Flexibility Act or to explain the rationale for their actions to assure that any such proposals were given serious consideration.

**C.      The Rule**

62. The Rule separates waters into three jurisdictional categories under the CWA: waters that are always jurisdictional, waters "that require a case-specific significant nexus evaluation" to determine if they are jurisdictional, and waters always excluded from jurisdiction.

63. In the first category are waters that are categorically jurisdictional. Six types of waters qualify under the Rule: (1) "traditional navigable waters," (2) interstate waters, (3) territorial seas, (4) impoundments of any water deemed to be a "water of the United States," (5) certain tributaries, and (6) certain waters that are "adjacent" to the foregoing five categories of waters. 33 C.F.R. § 328.3(a).

64. "Traditional navigable waters" are "waters that are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which

are subject to the ebb and flow of the tide." 80 Fed. Reg. at 37,074; *see The Daniel Ball*, 10 Wall. 557, 563 (1871).

65.  "Interstate waters" are waters that cross state borders, "even if they are not navigable" and "do not connect to [navigable] waters." 80 Fed. Reg. at 37,074.

66.  "Territorial seas" are "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." CWA § 502(8).

67.  A covered "tributary" is defined in the Rule as any water that flows "directly or through another water or waters to a traditional navigable water, interstate water, or territorial sea." 33 C.F.R. § 328.3(c)(3). To count as a jurisdictional water, the tributary (A) must "contribute flow" directly or through any other water—such as ditches or wetlands—to a traditional navigable water, interstate water, or territorial sea, and (B) must be "characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark" (OHWM). *Ibid*.

68.  OHWM is defined broadly and vaguely as "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, and other appropriate means." 33 C.F.R. § 328.3(c)(6). The Corps has acknowledged, in a guidance document issued during the notice and comment period (but not itself subject to notice and comment), that "problematic situations" making OHWM "difficult to interpret" are common.[16]

---

[16]  *See* U.S. Army Corps of Engineers Engineer Research and Development Center, *A Guide to Ordinary High Water Mark (OHWM) Delineation for Non-Perennial Streams in the Western Mountains, Valleys, and Coast Region of the United States* (Aug. 2014) (perma.cc/FCF8-HYD9).

69.  The Preamble to the Rule explains that the physical indicators of a bed and banks and OHWM may be detected not only by "direct field observation," but also by tools such as "remote sensing sources" or "mapping information," including "USGS topographic data, the USGS National Hydrography Dataset (NHD), Natural Resources Conservation Service (NCRS) Soil Surveys, and State or local stream maps," "aerial photographs, and light detection and ranging (also known as LIDAR) data," as well as "desktop tools" for "hydrologic estimation of a discharge sufficient to create an [OHWM], such as a regional regression analysis or hydrologic modeling." 80 Fed. Reg. at 37,076-77. The Preamble makes clear that regulators can use these desktop computer models "*independently* to infer" jurisdiction over a tributary without "a field visit" or where "physical characteristics" of bed and banks and an OHWM "are absent in the field." *Id.* at 37,077 (emphasis added).[17] And regulators and private citizens may rely on "historic records" or "historical presence of tributaries," not just current data, and so base identification of a tributary on features that are no longer present. *Id.* at 37,077-78.

70.  A covered "adjacent water" is defined as any water bordering, contiguous to, or "neighboring" a traditional navigable water, interstate water, territorial sea, impoundment of any of the above, or covered tributary (together, "jurisdictional waters (1)-(5)"). 33 C.F.R. § 328.3-(c)(1). "Neighboring" waters are defined as waters, any part of which are located: (A) within 100 feet of the OHWM of any jurisdictional waters (1)-(5), (B) within the 100-year floodplain of any jurisdictional waters (1)-(5), and not more than 1,500 feet from the OHWM of such water, or (C) within 1,500 feet of the high tide line of a traditional navigable water, interstate water, or territorial sea, or within 1,500 feet of the OHWM of the Great Lakes. *Id.* § 328.3(c)(2).

---

[17]  On that score, the Preamble contradicts the Corps' August 2014 guidance (*see supra* n.16), which states that "OHWM delineations should not rely solely on evaluation of remotely sensed imagery or hydrologic information. Field assessment or verification of physical evidence should always be performed, and the OHWM should be tied to physical features whenever possible."

71.   In the second category are waters "that require a case-specific significant nexus evaluation" to determine if they are jurisdictional. 80 Fed. Reg. at 37,073. In this category, Defendants have placed five subcategories of waters that are always "similarly situated" for purposes of a significant nexus determination: non-adjacent Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands. 33 C.F.R. § 328.3(a)(7). The Rule identifies two other broad subcategories of waters that are also subject to jurisdiction based on a case-specific significant nexus determination: (A) waters, any part of which are within the 100-year floodplain of a traditional navigable water, interstate water, or territorial sea, or (B) waters, any part of which are within 4,000 feet of the high tide line or OHWM of any of those jurisdictional waters, any impoundment of those jurisdictional waters, or any covered tributary. *Id.* § 328.3(a)(8).

72.   For purposes of this second category, the Rule defines the term "significant nexus" as a "significant effect (more than speculative or insubstantial) on the chemical, physical, or biological integrity, of a traditional navigable water, interstate water, or territorial sea," assessed either "alone, or in combination with other similarly situated waters in the region, based on the functions the evaluated waters perform." 33 C.F.R. § 328.3(c)(5). The Rule provides that examples of such "functions" (only one of which need be satisfied) include "sediment trapping," "nutrient recycling," "pollutant trapping, transformation, filtering, and transport," "retention and attenuation of flood waters," "runoff storage," "contribution of flow," "export of organic matter," "export of food resources," and "provision of life cycle dependent aquatic habitat" for "species located in" traditional navigable waters, interstate waters, or the territorial seas. *Ibid*.

73.   In the third category are waters always excluded from jurisdiction. These include "swimming pools;" "small ornamental waters;" "prior converted cropland;" "waste treatment

systems;"[18] small subsets of ditches that do not, directly or indirectly, flow to a traditional navigable water, interstate water, or territorial sea; ditches with ephemeral or intermittent flow that do not drain wetlands, relocate a tributary, or excavate a tributary; "farm and stock watering ponds;" "settling basins;" "water-filled depressions incidental to mining or construction activity;" "puddles;" "subsurface drainage systems;" and "wastewater recycling structures"—but in many instances, only when these features occur in "dry land," which is undefined. 33 C.F.R. § 328.3(b).

74. Because of the vagueness and uncertainty of the Rule's provisions for identifying tributaries, Plaintiffs and their members will be unable to determine whether a possibly excluded feature was "created in dry land" or "relocated a tributary" or was "excavated in a tributary" and so falls outside the exclusion. For example, knowing whether ditches (which are ubiquitous) relocated or were excavated in a tributary depends on being able to identify tributaries, which may exist where there are no current on-the-ground indicators that a tributary exists or existed.

75. The Rule violates the Constitution, the CWA, and the APA for the following reasons, among others:

a) Defendants subverted the notice-and-comment process by failing to seek comment on scientific reports relied on in the Rule, failing to seek comment on major revisions to the Proposed Rule, and engaging in an unprecedented advocacy campaign in support of the Proposed Rule during the comment period that demonstrated a closed mind to comments and violated the Anti-Lobbying Act, 18 U.S.C. § 1913.

---

[18]   The Preamble of the Rule affirms (at 244 n.13) that the Agencies did not intend to make any changes to the waste treatment system exclusion. Yet the Rule itself, as it amends Part 122, omits a longstanding and important footnote that previously suspended the provision that limits the exclusion to only manmade waterbodies not created in a water of the United States or resulting from an impoundment of such water. To the extent the Rule eliminates the suspension of that provision, such elimination further violates the APA and CWA because it is arbitrary and capricious, not in accordance with law, and was promulgated without notice and comment.

Case 3:15-cv-00165   Document 1   Filed on 07/02/15 in TXSD   Page 24 of 29

b)    The Rule expands Defendants' CWA jurisdiction far beyond the bounds of the Commerce Clause and the federalism limits embodied in the Constitution, the CWA, and governing Supreme Court precedent, and does so without any clear statement from Congress.

c)    The Rule asserts CWA jurisdiction over interstate waters (and all waters related to interstate waters in ways specified in the Rule), for which there is no constitutional or statutory basis. For example, the Rule purports to establish jurisdiction over any and all "interstate waters," no matter how small, and even if they are not remotely navigable and are entirely isolated, with no discernible connection to a traditionally navigable water.

d)    The Rule is vague and fails to put regulated parties on notice of when their conduct violates the law. Plaintiffs and their members cannot reasonably determine based on the face of the relevant statutes and regulations what is required of them. The Rule's definitions of tributaries, excluded ditches and water management features, adjacency, and significant nexus, among others, are unconstitutionally vague, violate due process, are not authorized by the CWA, and are arbitrary and capricious and unsupported by law.

e)    For example, the Rule's significant nexus test, which is not supported by any plausible reading of *Rapanos* or *SWANCC*, is hopelessly vague. Regulated parties have no way to know, *ex ante*, which waters have a "significant nexus" to jurisdictional waters. The test relies on subjective terms like "integrity," "significant effect," "not insubstantial," "similarly situated waters in the region," and "the functions the evaluated waters perform." 33 C.F.R. § 328.3(c)(5). Instead of bringing clarity and certainty to the Agencies' jurisdiction under the CWA, the Rule leaves the definition of "waters of the United States" subjective and unpredictable. Regulated parties are wholly dependent on the Agencies' and citizen-activists' subjective *ex post* evaluations and cannot know on the face of the Rule what conduct is prohibited.

f)    Under the Rule's definition of tributary, it is impossible to know whether particular features qualify as jurisdictional "tributaries" without a case-specific and subjective deter-

24

mination by the Agencies. The criteria set by the Rule require subjective determinations such as whether the feature at issue possesses the relevant indicia of a bed, bank, and OHWM. And the Rule explains that the Agencies may rely on "remote sensing sources of information or mapping . . . to establish the presence of" those features, meaning that the Agencies can make determinations remotely from a desk, using satellite images and estimation software unavailable to the public, without actually ever viewing the "water feature" in person, and regardless of whether the purported physical characteristics are in fact observable or even present in the field. 80 Fed. Reg. at 37,076.

g)    The Rule's concept of "adjacent" waters is plainly inconsistent with the Supreme Court's decision in *SWANCC*. It is also vague and uncertain because it rests on relationships to tributaries, which are vaguely defined, and to 100-year flood plains, which often are not mapped at all, or maps are out of date, leaving the Agencies and their private citizen proxies to rely on a hodge-podge of "available tools" that do not objectively or accurately identify flood plains and leave Plaintiffs and their members guessing as to whether particular waters are "adjacent." *See* 80 Fed. Reg. at 37,081.

h)    The Rule's expansive definition of waters subject to a case-specific significant nexus analysis to include any water any part of which falls within 4,000 feet of the high tide line or OHWM of any jurisdictional waters furthermore exceeds the Agencies' Commerce Clause authority and violates the federalism limits embodied in the CWA, the plain language of the CWA's jurisdictional provision, and Supreme Court precedent interpreting the A CWA. It is also unsupported by the scientific evidence.

i)    The Rule's case-specific significant nexus test, which involves determining an applicable "region," identifying any similarly situated waters "in the region," and performing either an individual or aggregated significant nexus evaluation, violates the Due Process Clause, the APA, and the plain language of the CWA. The smallest "region" that may be used where the

single point of entry watershed is large is a typical 10-digit hydrologic unit code (HUC-10) watershed, which is between 62 and 390 square miles, or 40,000 to 250,000 acres. The Rule thus requires land users to know and assess enormous land areas well beyond their own holdings.

j)     The exclusions described above (33 C.F.R. § 328.3(b)) are narrow, vague, and uncertain—for example, because there is no explanation of how to determine whether existing features were "created in dry land" or whether long-since-dry features once carried water and therefore may be deemed a "tributary."

k)     The Rule fails to establish the precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.

l)     The Rule's specification that a significant nexus can be shown through a feature's "provision of life cycle dependent aquatic habitat" for "species located in" traditional navigable waters, interstate waters, or the territorial seas (33 C.F.R. § 328.3(c)(5)) effectively reinstates the migratory-bird-rule logic for jurisdiction and therefore is unlawful under the Supreme Court's decision in *SWANCC*.

m)     Several of the Rule's provisions are ungrounded in the scientific evidence that was before the Agencies. For example, the definitions of "adjacent" and "significant nexus" are based on a "connectivity" concept. The scientific evidence shows that connectivity exists along a gradient and thus requires attention to site-specific factors. But, in a failed effort to mitigate the Rule's vagueness and unpredictability, Defendants have drawn hard and arbitrary lines in the sand, at scientifically indefensible boundaries like the limits of 100-year floodplains or 1,500 feet from OHWMs, without regard for site-specific factors like soil type and conditions; slope; the frequency, duration, magnitude, and predictability of rain fall; frequency of flow, distance to navigable waters; or other factors.

76.  The Rule purports to establish jurisdiction over waters in a manner inconsistent with the plain text of the CWA, inconsistent with Supreme Court precedent interpreting the CWA, and in excess of the Agencies' power under the Commerce Clause.

## CLAIMS FOR RELIEF

### First Cause of Action: Violation of 5 U.S.C. § 706(2)(A)

77.  Plaintiffs incorporate by reference the preceding allegations of this Complaint.

78.  The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A) because, among other things, the Rule is unsupported by law, unsupported by the scientific and economic evidence that was before the Agencies, and is inconsistent with the plain language of the CWA.

### Second Cause of Action: Violation of 5 U.S.C. § 706(2)(B)

79.  Plaintiffs incorporate by reference the preceding allegations of this Complaint.

80.  The Rule is "contrary to constitutional right, power, privilege, or immunity" in violation of 5 U.S.C. § 706(2)(B) because, among other things, the Rule exceeds the Agencies' authority under the Commerce Clause of Article I, Section 8 insofar as it regulates waters that are not channels of interstate commerce and otherwise bear no connection to interstate commerce; and violates the Due Process Clause of the Fifth Amendment to the United States Constitution insofar as it fails to give fair notice of what conduct is forbidden under the criminal provisions of the Clean Water Act and grants impermissible *ad hoc* discretion to the Defendants, guaranteeing arbitrary enforcement.

### Third Cause of Action: Violation of 5 U.S.C. § 706(2)(C)

81.  Plaintiffs incorporate by reference the preceding allegations of this Complaint.

82.  The Rule was promulgated "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of 5 U.S.C. § 706(2)(C) because the definition

of "waters of the United States" in the Rule is inconsistent with, and in excess of, the Defendants'
statutory authority under the CWA.

### Fourth Cause of Action: Violation of 5 U.S.C. § 706(2)(D)

83.   Plaintiffs incorporate by reference the preceding allegations of this Complaint.

84.   The Rule was promulgated "without observance of procedure required by law" in
violation of 5 U.S.C. § 706(2)(D) because, among other things:

> a)   Defendants failed to disclose final versions of key supporting documents,
analyses, and evidence during the notice and comment process in violation of 5 U.S.C. § 553;

> b)   Defendants made substantial changes to the Rule and its preamble between
publication of the Proposed Rule and promulgation of the Final Rule without inviting additional
comments from the public;

> c)   Defendants failed to undertake a regulatory flexibility analysis as required by the
Regulatory Flexibility Act of 1980, as amended, 5 U.S.C. § 601-612;

> d)   Defendant EPA's unprecedented public advocacy in support of the Proposed
Rule undermined the proper functioning of the notice-and-comment process and violated the
Anti-Lobbying Act, 18 U.S.C. § 1913.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)   declare that the Rule is unlawful because its promulgation was arbitrary, capri-
cious, an abuse of discretion, and not in accordance with law;

(2)   declare that the Rule is unlawful because it exceeds the government's authority
under the Commerce Clause, violates the Due Process Clause of the Fifth
Amendment, and is otherwise contrary to constitutional rights and powers;

(3)  declare that the Rule is unlawful because it is inconsistent with, and in excess of, the Defendants' statutory authority under the CWA;

(4)  declare that the Rule is unlawful because it was promulgated without observance of procedure required by law;

(5)  enter an order vacating the Rule;

(6)  enjoin Defendants from implementing, applying, or enforcing the Rule;

(7)  award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

(8)  grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated:  July 2, 2015

Respectfully Submitted,

*/s/ Kevin S. Ranlett*

Kevin S. Ranlett
Texas Bar No. 24084922
S.D. Tex. Bar No. 1124632
   MAYER BROWN LLP
   700 Louisiana Street, Suite 3400
   Houston, Texas 77002
   (713) 238-3000 (tel.)
   (713) 238-4888 (fax)
   kranlett@mayerborwn.com

Timothy S. Bishop
Michael B. Kimberly
E. Brantley Webb
   MAYER BROWN LLP
   1999 K Street NW
   Washington DC, 20006
   (202) 263-3127 (tel.)
   (202) 263 3300 (fax)
   tbishop@mayerbrown.com
   mkimberly@mayerbrown.com
   bwebb@mayerbrown.com

*Counsel for Plaintiffs*